UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:12-cr-00160-JAW-02 |
| | ) | |
| MALCOLM A. FRENCH, et al. | ) | |

**ORDER ON RODNEY RUSSELL'S MOTION FOR NEW TRIAL**

A Defendant awaiting sentence has moved for a new trial based on assertions that the prosecutor misstated the evidence during his closing argument and rebuttal. The Court denies the Defendant's motion for new trial because it was filed twenty months late and because there is no excusable neglect for the late filing. Assuming the Court should reach the merits, however, the Court concludes that the prosecutor's argument both in closing and rebuttal was based on the evidence or upon inferences that could reasonably be drawn from the evidence and that the Defendant has demonstrated no impropriety.

**I.   BACKGROUND**

   **A.   Superseding Indictment, Trial, and Conviction**

On September 14, 2012, a federal grand jury indicted Malcolm A. French, Rodney Russell, Kendall Chase, and Haynes Timberland, Inc. for a set of federal crimes. *Indictment* (ECF No. 2). On November 13, 2013, in relevant part, a grand jury indicted Mr. Russell for conspiracy to manufacture 1,000 or more marijuana plants, manufacturing 1,000 or more marijuana plants, maintaining a drug-involved

place, harboring illegal aliens, and conspiracy to distribute and possess with the intent to distribute marijuana. *Superseding Indictment* (ECF No. 187).

The case went to trial from January 8, 2014 through January 24, 2014. On January 24, 2014, the jury returned verdicts finding Malcolm French, Rodney Russell, and Kendall Chase guilty of engaging in a conspiracy to manufacture marijuana, finding Malcolm French and Rodney Russell guilty of manufacturing marijuana, finding Malcolm French, Rodney Russell, and Haynes Timberland, Inc. guilty of managing or controlling a drug-involved premises, finding Malcolm French and Rodney Russell guilty of harboring illegal aliens, and finding Malcolm French, Rodney Russell, and Kendall Chase guilty of engaging in a conspiracy to distribute marijuana. *Jury Verdict Form* (ECF No. 311). As to the drug trafficking conspiracy as a whole, the jury found beyond a reasonable doubt that it involved 1,000 or more marijuana plants; the jury also found beyond a reasonable doubt as to Defendants Malcolm French and Rodney Russell, their individual conduct involved 1,000 or more marijuana plants. *Id.*

B.  **Procedural History**

On October 18, 2015, Mr. Russell filed a motion for new trial. *Def. Rodney Russell's Mot. for New Trial and Withdrawal of all Joinder with Claims the Gov't Suborned Perjury* (ECF No. 590) (*Def.'s Mot.*).[1] On October 21, 2015, the Government responded to Mr. Russell's amended motion. *Gov't's Obj. to Def. Russell's Mot. for*

---

[1] The Court is addressing in a separate order the portion of this motion that deals with Mr. Russell's limited joinder in a motion for new trial filed by Malcolm French.

2

*New Trial* (ECF No. 594) (*Gov't's Opp'n*).  Mr. Russell has not filed a reply to the Government's response.

## II.   THE PARTIES' POSITIONS

### A.   Rodney Russell's Motion

Mr. Russell's motion for new trial is "based on seven discrepancies defendant Russell has noticed between the trial evidence and the Government's closing and rebuttal arguments." *Def.'s Mot.* at 1-2.

First, oddly, in his motion for new trial, Mr. Russell objects to the supervisor enhancement under the United States Sentencing Guidelines § 3B1.1(b) in the Presentence Report, an argument that addresses a sentencing issue.[2]  *Def.'s Mot.* at 3-4 (citing Presentence Investigation Report ¶¶ 31-32).  As this is a sentencing issue, the Court has not considered it in resolving Mr. Russell's motion for new trial.

Next, Mr. Russell turns to six statements in the Government's closing and rebuttal arguments that he maintains entitle him to a new trial.  He describes the arguments as "not well-founded." *Id.* at 4-6.  First, he says that during the closing argument, the Government's attorney argued that significant weight gain— "put[ting] on thirty to forty pounds between the dates of delivery and trial"— prevented a particular witness from identifying him.  Mr. Russell, however, claims to have gained only six pounds: "between January 30, 2007 and September 11, 2013, his

---

[2]   The Court has not described this issue any further.  The Court will consider this argument at Mr. Russell's sentencing hearing, if pressed, but it is unclear how the application or not of the supervisor enhancement under the United States Sentencing Guidelines would entitle him to a new trial.

3

weight fluctuated between 176 pounds and 182 pounds." *Id.* at 4. Therefore, he argues there was no basis for the Government's argument about his weight gain.

Second, Mr. Russell objects to the Government closing argument that his DNA was not found at the grow site because he may have burned it. *Id.* at 5. He contends that this was not a justified inference.

Third, he criticizes the Government's argument that Mr. Russell warned Moises Soto to stay in Mexico and not to return to Maine. *Id.* He says there is no evidence supporting the Government's assertion. *Id.*

Fourth, he contends the Government's argument that Scott MacPherson was destitute and lacked the means to make cash payments to Griffin Greenhouse for PRO-MIX was unfounded. *Id.*

Fifth, he disagrees with the Government's suggestion that he had the time to spend on the grow operation. *Id.* at 5-6. He says that his medical problems and his presence at Mr. French's LaGrange garage belie these arguments. *Id.*

Finally, Mr. Russell maintains that the Government made "an unfair comment on his testimony" by branding "incredulous" the notion that anyone would resell PRO-MIX. *Id.* at 6.

Mr. Russell moves for new trial pursuant Rule 33(b)(2), which he concedes requires the motion to be filed within fourteen days after the verdict. *Id.* at 6 (citing FED. R. CRIM. P. 33(b)(2)). Referring to Rule 45(b)(1)(B), however, Mr. Russell "avers that excusable neglect for late filing can be shown by the pendency of this matter, which pendency has not been caused by him, as well as by his inability to track down

4

trial transcripts." *Id.* (citing FED. R. CRIM. P. 45(b)(1)(B)). Mr. Russell puts forth a substantive legal test for determining whether the Government's supposedly improper closing argument "so poisoned the well that a new trial is required": "(1) the extent of the improper remarks, (2) the context, (3) the likely effect of any curative instructions given by the judge, and (4) the weight of the evidence against the defendant." *Id.* at 7 (citing *United States v. Carpenter*, 494 F.3d 13, 23 (1st Cir. 2007)). According to Mr. Russell, the enumerated discrepancies caused "the well of evidence considered by the jury [to be] poisoned beyond purification." *Id.*

### B. The Government's Opposition to Mr. Russell's Amended Motion

In its opposition, the Government stresses that Mr. Russell's Rule 33(b)(2) motion comes 632 days after his conviction and is 618 days past due. *Gov't's Opp'n* at 1, 3, 4, 5. The Government argues the following test applies to whether Mr. Russell has shown excusable neglect:

> (1) "the danger of prejudice to the [opposing party]"; (2) "the length of the delay and its potential impact on judicial proceedings"; (3) "the reason for the delay, including whether it was within the reasonable control of the movant"; and, (4) "whether the movant acted in good faith."

*Id.* at 2 (quoting *United States v. Boesen*, 599 F.3d 874, 879 (8th Cir. 2010)). Under prejudice, the Government writes of the "danger of witnesses disappearing or memories fading is very real." *Id.* Under length of delay, the Government points again to the extreme tardiness of Mr. Russell's motion. *Id.* at 3. Under reason for delay, the Government casts as irrelevant Mr. Russell's excuse regarding the matter's pendency by noting that his excuse did not "offer an explanation as to *how* this period of delay *prevented* him from making a timely motion for new trial," *id.* (emphasis in

5

original), and the Government attempts to discredit his supposed inability to get trial transcripts by explaining the various ways in which the transcripts—which "are not historical documents squirreled away in the basement of a museum"—could have been obtained. *Id.* at 4. Finally, the Government "leaves the Court to draw its conclusions regarding whether [Mr. Russell] acted in 'good faith.'" *Id.* at 4-5. It nonetheless suggests the Court consider Mr. Russell's myriad post-trial filings as well as his failure to include affidavits on which it could even base a finding of good faith. *Id.* at 5 (citing D. ME. LOC. R. 147(a)).

### III.   DISCUSSION

#### A.   Timeliness

Rule 33(b)(2) stipulates "[a]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." FED. R. CRIM. P. 33(b)(2). Here, Mr. Russell has not based his motion on an assertion of newly discovered evidence and therefore the fourteen-day period applies. In this case, the Court entered the jury verdicts against Mr. Russell on January 24, 2014, *Jury Verdict* (ECF No. 311), and Mr. Russell's motion for new trial was due no later than February 7, 2014. FED. R. CRIM. P. 45(a)(1). Filed on October 18, 2015, Mr. Russell's motion is more than twenty months late. Following *Eberhart v. United States*, 546 U.S. 12 (2005), the failure to file a timely motion for new trial under Rule 33(b) is no longer jurisdictional but is considered a violation of a non-jurisdictional "claims-processing" rule. *Id.* at 16. The difference between the jurisdictional and non-jurisdictional bases for the time limits is that the government

6

may now forfeit the time limit by failing to object on the grounds of untimeliness. *Id.* at 18 ("'[F]ailure to object to untimely submissions entails forfeiture of the objection"). At the same time, the *Eberhart* Court described rules such as Rule 33 as "inflexible" claim-processing rules because of "Rule 45(b)'s insistent demand for a definite end to proceedings." *Id.* at 19.

Once the fourteen-day period has elapsed, there is one escape hatch through Rule 45(b):

> When an act must or may be done within a specified period, the court on its own may extend the time, or for good cause may do so on a party's motion made: . . . (B) after the time expires if the party failed to act because of excusable neglect.

FED. R. CRIM. P. 45(b)(1)(B).

In evaluating whether a party has cleared the "excusable neglect" hurdle, courts have used the four-factor test the Supreme Court set forth in *Pioneer Inv. Servs. Co. v. Brunswick Assocs. LP*, 507 U.S. 380 (1993). The four *Pioneer* factors are: (1) "the danger of prejudice to the [non-moving party]"; (2) "the length of the delay and its potential impact on judicial proceedings"; (3) "the reason for the delay, including whether it was within the reasonable control of the movant"; and (3) "whether the movant acted in good faith." *Graphic Commc'ns Int'l Union, Local 12-N v. Quebecor Printing Providence, Inc.*, 270 F.3d 1, 5 (1st Cir. 2001) (quoting *Pioneer* 507 U.S. at 395). *See also United States v. Boesen*, 599 F.3d 874, 878-80 (8th Cir. 2010) (applying *Pioneer* test for excusable neglect in the context of an untimely Rule 33 motion for new trial). Moreover, "[t]he First Circuit has repeatedly upheld findings of 'no excusable neglect' where the court cited the absence of unique or

extraordinary circumstances." *EnvisioNet Comput. Serv.s, Inc. v. ECS Funding LLC*, 288 B.R. 163, 166 (D. Me. 2002) (citing *Graphic Commc'ns*, 270 F.3d at 6; *Mirpuri v. ACT Mfg., Inc.*, 212 F.3d 624, 631 (1st Cir. 2000)).

Here, the first and the second factors reinforce each other. The length of the delay, 618 days, heightens the concern that memories will fade and witnesses will become unavailable, thereby substantially prejudicing the Government's case against Mr. Russell. The third factor merits close attention, as "among the factors enumerated in *Pioneer*, [it is] by far the most critical . . . ." *Dimmitt v. Ockenfels*, 407 F.3d 21, 24 (1st Cir. 2005) (citing *Hospital del Maestro v. NLRB,* 263 F.3d 173, 175 (1st Cir. 2001) (per curiam)). Although he has filed 632 days after the verdict and 618 days after the deadline, Mr. Russell offers sparse support for his assertion of excusable neglect; he only "avers that excusable neglect for late filing can be shown by pendency of this matter, which pendency has not been caused by him, as well as by his inability to track down trial transcripts." *Russell Mot.* at 6.

The Court is unpersuaded. It is true that numerous post-verdict motions have caused the case to drag on. But all four post-verdict motions that were filed after the fourteen-day period, except for his most recent motion, were grounded on claims of newly discovered evidence and therefore came under Rule 33(b)(1)'s three-year limitation. *Def.'s Mot. for New Trial (F.R. Crim. P. 33(a))* at 1 (ECF No. 440) ("Defendant . . . moves this Court to schedule an evidentiary hearing to determine whether to vacate the jury's verdict and order a new trial on the basis [of] newly discovered evidence"); *Def. Rodney Russell's Mot. to Vacate Conviction and Mot. for*

*New Trial (F.R. Crim. P. 33(a))* at 4 (ECF No. 441) (contending that the motion was based on newly discovered evidence and therefore the three-year limitation applied); *Def. Chase's Mot. for New Trial* at 1 (ECF No. 461) ("Defendant, Kendall Chase, . . . moves for a new trial based on newly discovered evidence"); *Def.'s Third Mot. for New Trial Pursuant to F.R.Crim.P 33* at 21-25 (ECF No. 554) (claiming that the basis of the motion was newly discovered evidence). Mr. Russell does not explain why the pendency of other timely filed motions should excuse his untimely filed motion, and the Court does not consider the pendency of other post-verdict motions to be excusable neglect for Mr. Russell's violation of the applicable time limits of Rule 33(b)(2).

Mr. Russell's other excusable neglect argument is that he could not "track down trial transcripts." *Def.'s Mot.* at 6. Mr. Russell does not further explain this excuse. Mr. Russell's motion is based primarily on the federal prosecutor's closing and rebuttal arguments, and the Court's docket establishes that the court reporter filed a transcript of the closing argument on February 12, 2015, *Partial Tr. of Proceedings* (ECF No. 471) (*Closing Argument by Mr. Casey*) (*Casey Closing*), and a transcript of his rebuttal argument about a year earlier on February 11, 2014. *Partial Tr. of Proceedings* (ECF No. 322) (*Closing Argument by Mr. Marjerison and Rebuttal Closing Argument by Mr. Casey*) (*Casey Rebuttal*). Mr. Russell has not addressed why, if the transcripts were unavailable, he could not have ordered them and filed a timely motion to extend the time for filing this motion while he awaited the transcripts. The Court finds that the procuring of transcripts was within Mr. Russell's reasonable control. What AUSA Casey argued during his closing and

rebuttal was open and audible during the trial in January 2014. Mr. Russell and his counsel must have heard them, but they failed to file a timely motion based on these alleged misstatements of the evidence until this October.

The first three *Pioneer* factors counsel strongly against finding excusable neglect on the facts in this case; as regards the fourth *Pioneer* factor, the Court assumes Mr. Russell acted in good faith in bringing his late motion, but this last factor does not carry the day. The Court concludes that Mr. Russell's post-verdict motion for new trial is untimely pursuant to Federal Rule of Criminal Procedure 33(b)(2).

### B. The Merits

To close the circle, the Court will address the merits of Mr. Russell's motion, even though the Court has concluded it is time-barred. In his motion, Mr. Russell identifies remarks that the prosecutor made either in closing argument or in rebuttal that he believes were "not well-founded" or constituted "an unfair comment on his testimony." *Russell Mot.* at 4-6.

#### 1. Rodney Russell's Weight Gain

Regarding Mr. Russell's weight, the prosecutor asked the jury to look at a photograph of Mr. Russell that Linda Archer, one of the Government's witnesses, viewed and to compare the photograph with Mr. Russell's physical appearance in the courtroom. *Casey Rebuttal* 23:4-22. This argument was based on evidence before the jury—a photograph of Mr. Russell and his physical appearance in the courtroom—and the jury could have reasonably compared the older photograph with their own

view of Mr. Russell. Mr. Russell's claim that his weight had not changed over a number of years up to trial is undercut by the fact that his last documented weight was September 11, 2013 and the trial took place in January 2014. In any event, the Court rejects the assertion that the prosecutor's argument was not based on the evidence.

### 2. The Lack of DNA Evidence

Regarding his complaint about AUSA Casey's reference to the absence of DNA evidence, *Casey Rebuttal* 20:1-7, the Court notes that when Attorney Peterson gave his closing argument, he stressed to the jury that the Government had produced no DNA evidence linking Mr. Russell to the marijuana grow site in Township 37:

> Most importantly of - - of all - - and Mr. McKee stated this very well - - is the DNA evidence. DNA, as we know, is a forensic tool. It's become increasingly important in finding whether somebody's guilty or exonerating them. In this case, they did a DNA swab on my client, Rodney Russell, and it does not match any evidence at the site. Now, that is very important because they say that he was physically up there, that he slept there, that he was involved in the dry shacks, that he was in the bathroom privy, and other areas on the site. Now, if he was staying up there that intimately, why wouldn't his DNA be detected on something, on something, anything? But it's not there.

*Partial Tr. of Proceedings* 7:1-12 (ECF No. 549) (*Closing Argument by Mr. Peterson*). AUSA Casey's rejoinder—that one of the reasons they could not find the Defendants' DNA at the site because the Defendants burned it down—was based on evidence before the jury and, in the Court's view, is a fair rebuttal.

### 3. Rodney Russell's Conversations with Moises Soto While Moises Soto Was in Mexico

Mr. Russell says AUSA Casey argued at closing that Mr. Russell "called Moises Soto to tell him to stay in Mexico and not return to Maine." *Def.'s Mot.* at 5. In full,

the transcript shows that AUSA Casey argued to the jury that Mr. Russell had contacted Moises Soto while Mr. Soto was in Mexico, that Mr. Russell paid Mr. Soto money, and that Mr. Russell told him to stay away, causing Mr. Soto to remain in Mexico. *Casey Closing* 10:4-7.

The Court reviewed Moises Soto's trial testimony and finds that AUSA Casey's comments were fair argument. *Partial Tr. of Proceedings* (ECF No. 369) (*Test. of: Moises Soto*). Mr. Soto testified that upon learning of the police raid on Township 37 via phone from Mexico, he travelled to Maine to help workers who were in hiding escape, then he returned to Mexico and did not go back to Maine until early 2013—roughly four years later. *Id.* 35:18-12, 70:2-4. Mr. Soto testified that he was in touch with Mr. Russell after his return to Mexico, that he asked Mr. Russell for money so that Mr. Soto could stay in Mexico, and that Mr. Russell arranged to have a total of $8,000 paid to Mr. Soto through Mr. Soto's stepson. *Id.* 37:27-38:13; 44:3-18. Mr. Soto did not testify that Mr. Russell had come out and told him to remain in Mexico, but he did state that he had asked Mr. Russell for money so that he could stay in Mexico and that Mr. Russell arranged to have $8,000 sent to him. The Court views AUSA Casey's argument either as supported by Mr. Soto's testimony or by a fair inference from that testimony.

### 4. Scott MacPherson's Financial Condition

Mr. Russell complains that AUSA Casey argued to the jury that Scott MacPherson, a co-conspirator who had paid for PRO-MIX at Griffin Greenhouse, did not have the funds to pay for these materials. *Def.'s Mot.* at 5. During his closing

argument, AUSA Casey did refer to Mr. MacPherson as "destitute" and "living off the charity of others." *Casey Closing* 28:17-29:7.

Malcolm French testified at some length about Scott MacPherson. *Partial Tr. of Proceedings* 41:2-44:23 (ECF No. 362) (*Test. of: Malcolm French I*) (*French I*). Mr. French said that when Mr. MacPherson returned to Maine from Buffalo, New York in 2006, Mr. MacPherson wrote to Mr. French, told him that he (Mr. MacPherson) had been hurt, and asked for work. *Id.* 43:1-7, 94:19-22. Mr. French told Mr. MacPherson that he was welcome to stay in his camp in LaGrange, and Mr. MacPherson stayed there for six months. *Id.* 43:8-15. After his camp stay, Mr. French explained that Mr. MacPherson moved to Colson Field and converted an office building to living quarters. *Id.* 43:20-23. Mr. French did not charge Mr. MacPherson any rent, and Mr. French paid Mr. MacPherson's electricity and heat. *Partial Tr. of Proceedings* 14:14-24 (ECF No. 363) (*Test. of: Malcolm French II*) (*French II*). After a time, Mr. French told Mr. MacPherson that he could stay at an office building that Mr. French owned near Township 37, but that Mr. French was not going to pay him.[3] *French I* 44:4-23. Mr. MacPherson converted the office building into living quarters. *Id.* 43:16-19. Subsequently, Mr. French said that Mr. MacPherson began to help him with conservation easements. *Id.* 45:1-48:25.

When he testified, Mr. Russell stated that in March 2009, he traveled with Scott MacPherson to Griffin Greenhouse where they purchased fertilizer. *Partial Tr. of Proceedings* 31:16-32:2 (ECF No. 364) (*Test. of: Rodney Russell*) (*Russell*). Mr.

---

[3] It appears that the garage on this property was also referred to as a warehouse. *Partial Tr. of Proceedings* 12:18-13:13 (ECF No. 364) (*Test. of: Rodney Russell*) (*Russell*).

Russell said that he ordered the material and signed for it, but that Scott MacPherson had told him to do so. *Id.* 31:16-32:10. Mr. Russell also said that Mr. MacPherson gave him cash to make the purchase and that he took "a lot of cash down." *Id.* 32:11-25. Mr. Russell testified that he had "[n]o idea" where the cash came from. *Id.* 33:7-8.

Gerald Davis, an employee of Griffin Greenhouse, testified that Mr. Russell came to Griffin Greenhouse about twelve times and purchased soils mix, PRO-MIX, fertilizer, and other items. *Partial Tr. of Proceedings* 11:20-13:5 (ECF No. 426) (*Test. of: Gerald Davis*). He recalled that the purchases were in cash, that they were for as much as $16,000, and that Mr. Russell presented the money in a Ziploc bag. *Id.* 15:2-15.

In context, AUSA Casey's argument addressed Mr. Russell's implication that it was not he, but Mr. MacPherson, who purchased the material from Griffin Greenhouse. AUSA Casey made the point that Mr. MacPherson did not have the money to purchase tens of thousands of dollars of PRO-MIX from Griffin Greenhouse. The fact that he was living in a converted office, was living rent free, was not paying his own heat or electricity, was not being paid for his services, all suggests that Mr. MacPherson was not a wealthy man; that is, he was not someone who could afford to make the significant purchases from Griffin Greenhouse made in this case. The fact that Mr. MacPherson was living rent free and that Mr. French was paying some of his bills substantiates AUSA Casey's reference to living off the charity of others. AUSA Casey's statement that Mr. MacPherson was destitute may contain a bit of

hyperbole, but Mr. MacPherson came back from Buffalo, was looking for work, lived rent free in his friend Malcolm French's property, and was not paid for his work. The Court therefore views AUSA Casey's argument as supported by the evidence.

### 5. Rodney Russell's Free Time

In his closing argument, AUSA Casey argued to the jury that Rodney Russell had "the time to devote to" the success of the marijuana operation. *Casey Closing* 2:18-19. Mr. Russell contends that this is not fair comment because he was having medical problems and because in a separate trial, the Government claimed that he was working for Mr. French during the time of the conspiracy. *Def.'s Mot.* at 5-6.

During his testimony, Mr. Russell informed the jury that he worked as a stockbroker for Paine Webber from 1998 to 2001 and for Brown Company from 2001 to 2006, when he was laid off. *Russell* 7:8-20. Since 2006, Mr. Russell said he worked briefly for Boston Financial in 2010, but that "other than that," he had worked in a self-employed capacity for Malcolm French, cutting and selling firewood. *Id.* 7:24-8:16. Based on Mr. Russell's testimony, as he was working on a self-employed basis for Mr. French from 2006 onward, the Court concludes that this evidence allowed the prosecutor to argue that Mr. Russell had the time to assist Mr. French in the marijuana conspiracy.

While Mr. Russell did have a number of medical problems from 2006 through 2009, the Court does not conclude that this prevented him from participating in the marijuana conspiracy or that AUSA Casey was prohibited from arguing that he had the free time to do so. For example, when Mr. Russell traveled with Scott

MacPherson to Griffin Greenhouse in March 2009, he had just broken his elbow and had not yet seen a doctor, but he was able to make the trip by holding his hand up during the ride.  *Id.* 31:20-32:6.

As regards Mr. Russell's argument that the Government took a contrary position while prosecuting Mr. Russell for false statements in connection with a health care benefit program, this argument is too undeveloped for the Court to respond.  A transcript of the false statements trial has been prepared, *see United States v. Russell*, No. 1:10-cr-00149-JAW, *Tr. of Proceedings* (ECF Nos. 94-97), but Mr. Russell has made no specific reference to the Government's position at that trial, such as the dates and times that the Government alleged Mr. Russell was working in LaGrange for Mr. French's business.  Furthermore, the fact that Mr. Russell was working for Mr. French does not suggest he did not have the time to become involved in the marijuana conspiracy.  If there is evidence of a contradictory governmental position, Mr. Russell has not made the argument.

Moreover, Mr. Russell's position contradicts his own testimony.  At the trial in this case, Mr. Russell testified that he began working in Mr. French's office in Enfield, Maine in April 2007 for "one week" when Mr. and Ms. French had to go away and needed someone to do payroll.  *Russell* 26:3-5.  Then in 2008, he said he worked at Mr. French's office "once a week, maybe three or four hours."  *Id.* 26:11-13.  This would hardly prevent him from participating in the conspiracy.  Furthermore, Mr. Russell's own testimony places himself in Washington County working with Scott MacPherson during much of the time the Government has said the conspiracy was

taking place.[4] *Russell* 8:4-11; 20:13-17; 20:25-21:7; 28:15-29:8; 30:20-23. Again, if there is evidence of a contradictory governmental position, Mr. Russell has not made the argument.

In short, Mr. Russell's claim that his medical problems and his work for Mr. French disallowed the Government's argument that he had the time to devote to the conspiracy is frivolous.

### 6. Resale of PRO-MIX "Incredulous"

Finally, Mr. Russell says that AUSA Casey observed that "because no one resells Pro-Mix, Rodney Russell's testimony was 'incredulous.'" *Def.'s Mot.* at 6. Mr. Russell argues that this is not a fair comment. *Id.*

During his testimony, Mr. Russell stated that when he ordered PRO-MIX from Griffin Greenhouse, he thought that Scott MacPherson was "[p]ossibly" going to use some of the PRO-MIX for salmon conservation work at Old Stream Conservation, and that Mr. MacPherson might have bought the PRO-MIX for resale. *Russell* 54:16-55:12 ("Could have been all resold").

Preliminarily, the Court could not locate in either AUSA Casey's closing or rebuttal arguments the word "incredulous." Mr. Russell cites pages 27 and 29 of the transcript of the closing argument, but the Court did not find the word on either page. The Court did find the following argument regarding the resale of PRO-MIX:

> Rodney thought that maybe Scott was reselling it. Like the Red Patch gang, Scott must have tapped into that lucrative Pro-Mix resale market. Don't forget, ladies and gentlemen, that Scott MacPherson's name and number doesn't appear on any of those Griffin Greenhouse records.

---

[4]    Mr. Russell testified that he had no involvement with Scott MacPherson or anyone else at Township 37 in 2009. *Russell* 34:13-15.

17

*Casey Closing* 29:9-13.[5] As far as the Court can determine, AUSA Casey did not argue that Mr. Russell's resale testimony was "incredulous."

Apart from Mr. Russell's testimony, there is no evidence that there is a resale market for PRO-MIX, which is a widely available and legal product, or that PRO-MIX would have a resale value when purchased from a retailer like Griffin Greenhouse. AUSA Casey would have been within bounds if he had argued that the jury should view that testimony with skepticism.

### C. The Closing Argument and Rebuttal and the Law

First, the Court has concluded based on its review of the evidence that none of the federal prosecutor's comments during his closing and rebuttal arguments was improper. Accordingly, as Mr. Russell's motion is premised on unfair or unsupported comments, it must fail.

Next, First Circuit law does not prevent prosecutors from arguing inferences from evidence admitted at trial and from pointing out reasonable inferences from that evidence. The First Circuit has restricted prosecutors to making arguments that "appear reasonably supported by the record or are within the prerogative of the

---

[5] The full paragraph reads:

> There's no corroboration for that story. That story doesn't hold water. Rodney thought that maybe Scott was reselling it. Like the Red Patch gang, Scott must have tapped into that lucrative ProMix resale market. Don't forget, ladies and gentlemen, that Scott MacPherson's name and number doesn't appear on any of those Griffin Greenhouse records.

*Casey Closing* 29:8-13. The Court views the first two sentences as referring to the paragraph just above, regarding Scott MacPherson's access to cash, and not what was to follow, regarding resale of PRO-MIX.

prosecution to characterize the evidence presented at trial and argue certain inferences to the jury." *United States v. Manor*, 633 F.3d 11, 19 (1st Cir. 2011) (quoting *United States v. Martinez-Medina*, 279 F.3d 105, 119 (1st Cir. 2002)). A close review of the prosecutor's comments and the evidence in this case demonstrates that the prosecutor's closing and rebuttal arguments fell well within the bounds of permissible commentary.

## IV. CONCLUSION

The Court DENIES Defendant Rodney Russell's Motion for New Trial and Withdrawal of all Joinder with Claims the Government Suborned Perjury (ECF No. 590) because the motion is untimely and non-meritorious.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR
UNITED STATES DISTRICT JUDGE

Dated this 12th day of November, 2015