# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:12-cr-00160-JAW-2 |
| | ) | |
| RODNEY RUSSELL | ) | |

## ORDER ON MOTION FOR COMPASSIONATE RELEASE

An individual serving a one hundred fifty-one-month sentence for a marijuana manufacturing and distribution operation, which also involved harboring illegal aliens, is currently released on bail pending appeal, pursuant to 18 U.S.C. § 3143(b). Following an unsuccessful appeal and still out on bail, he moves for compassionate release to home confinement and a modification of sentence under 18 U.S.C. § 3582(c)(1)(A). The Court does not reach whether a defendant may move for compassionate release while released on bail because even if the law permits him to do so, the individual failed to prove he is entitled to a sentence reduction. The Court concludes the individual's health conditions do not pose extraordinary and compelling reasons warranting a sentence reduction, and the seriousness of his offenses, the relatively short time he has served, and the need for the sentence served to fulfill the sentence imposed preclude his release. The Court dismisses the motion without prejudice.

## I.   PROCEDURAL BACKGROUND

### A.   Trial, Verdict and Sentence

On January 24, 2014, after a twelve-day trial, a jury found Rodney Russell guilty on eight counts, including manufacturing and conspiracy to manufacture marijuana plants, in violation of 21 U.S.C. §§ 841(a)(1) and 846, conspiracy to distribute and possess with intent to distribute marijuana, in violation of 21 U.S.C. § 846, maintaining a drug involved place, in violation of 21 U.S.C. §§ 856(a)(1) and (2), and harboring illegal aliens, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii) and (2). *Min. Entry* (ECF No. 308); *Jury Verdict Form* (ECF No. 311).  On April 21, 2016, after several unsuccessful motions for new trial, Mr. Russell was sentenced to one hundred fifty-one months imprisonment on five counts and sixty months on three counts all to be served concurrently, five years of supervised release on two counts and three years on six counts all to be served concurrently, and an $800 special assessment.  *Min. Entry* (ECF No. 656); *J.* (ECF No. 661).

### B.   Motion for New Trial and First Appeal

On April 28, 2016, Mr. Russell's co-defendant, Malcolm French, moved for a new trial, claiming that a juror failed to respond truthfully to her juror questionnaire and to a material voir dire question.  *Def.'s Malcolm French's Mot. for New Trial Pursuant to F.R. Crim. P. 33* (ECF No. 674).  On May 8, 2016, Mr. Russell moved to join Mr. French's motion for new trial.  *Def. Rodney Russell's Mot. to Join Def. Malcolm French's Mot. for New Trial and Mot. to Extend Time to File Supporting Memoranda* (ECF No. 682).  On August 22, 2016, while the motion for new trial was

pending, Mr. Russell filed a notice of appeal with the Court of Appeals for the First Circuit. *Notice of Appeal* (ECF No. 708). On November 16, 2016, the Court denied the motion for new trial. *Order Denying Mot. for New Trial* (ECF No. 734). The next day, Mr. Russell filed a revised notice of appeal to allow the First Circuit to consider any issues with this Court's order on the motion for new trial. *Revised Notice of Appeal Pursuant to United States v. George* (ECF No. 739).

On September 17, 2018, the Court of Appeals for the First Circuit affirmed the Court in part but concluded that the Court's investigation concerning the answers given by one of the jurors on the jury questionnaire was inadequate. *United States v. French*, 904 F.3d 111 (1st Cir. 2018). Therefore, the First Circuit vacated the Court's order denying the motion for a new trial and remanded for further proceedings on that motion. *Id.* at 125. The Court received the First Circuit's mandate on October 10, 2018. *Mandate* (ECF No. 791).

### C. Renewed Motion for New Trial, Second Appeal and Release on Bail Pending Appeal

On June 7, 2019, on remand from the First Circuit and after holding a post-conviction evidentiary hearing, the Court again denied the motion for new trial. *Order on Mot. for New Trial on Remand* (ECF No. 844). On June 12, 2019, Mr. Russell filed a notice of appeal. *Notice of Appeal* (ECF No. 846).

While the appeal was pending, Malcolm French filed an emergency motion for temporary bail with the First Circuit. Emergency Mot. for Temporary Bail, *United States v. French*, No. 19-1632 (1st Cir. Mar. 24, 2020). On March 26, 2020, the First Circuit denied Mr. French's motion without prejudice but noted that if Mr. French

3

filed a motion with the district court, the judge should "conduct any necessary proceedings on an expedited basis." *Order of Ct.* at 1 (ECF No. 855). In its March 26, 2020 order, the First Circuit observed that Mr. French "has raised a substantial question within the meaning of 18 U.S.C. § 3143(b)(1)(B)." *Id.* The First Circuit also noted that the Government had not relied on "any argument that defendant is a danger or a risk of flight." *Id.* The appellate court left "to the district court the question of whether defendant can demonstrate the existence of exceptional reasons why his continued detention would not be appropriate." *Id.* (citing 18 U.S.C. § 3145(c)). The First Circuit directed the district court to make "findings that account for defendant's as-yet-undisputed health conditions, relevant guidance from the Centers for Disease Control, and the protocols of the Bureau of Prisons." *Id.*

Following Mr. French's lead, Mr. Russell also filed an emergency motion for temporary bail with the First Circuit. Am. Emergency Mot. for Temporary Bail, *United States v. Russell*, No. 19-1605 (1st Cir. Mar. 25, 2020). The First Circuit quickly addressed the motion, concluding that Mr. Russell should have first presented the issues to this Court, and thus denied the motion without prejudice to re-file with this Court. *Order of Ct.* (ECF No. 858).

On March 26, 2020, Mr. Russell filed an emergency motion for temporary bail pending appeal with this Court. *Emergency Mot. for Temporary Bail Def.-Appellant Rodney Russell's Mot. to Be Released from Custody Pending Resolution Pursuant to Federal Rule of Appellate Procedure 9(b), 18 U.S.C. § 3143(b)(1), and 3145(c), and United States v. Zimny, 857 F.3d 97 (1st Cir. 2017)* (ECF No. 857). On March 27,

2020, the Court issued an interim order, resolving some, but not all the issues in the First Circuit order. *Interim Order on Emergency Mot. for Release* (ECF No. 859). On March 31, 2020, the Court made factual findings and granted the motion, releasing Mr. Russell on bail pending his appeal. *Order on Emergency Mot. for Release* (ECF No. 869). On October 7, 2020, the First Circuit ruled on Mr. French and Mr. Russell's motion for new trial, affirming this Court's denial of their motions. *United States v. French*, 977 F.3d 114 (1st Cir. 2020). The Court received the First Circuit's mandate on November 27, 2020. *Mandate* (ECF No. 881).

### D. Motion to Revoke Bail

On November 16, 2020, after the First Circuit's decision, the Government moved to revoke Mr. Russell's bail, reasoning that he no longer had an appeal pending that raised a substantial question of law or fact likely to result in reversal or an order for a new trial, and requesting expedited consideration. *Gov't's Mot. to Revoke Defs.' Bail Pending Appeal and Req. for Expedited Consideration* (ECF No. 877). On December 14, 2020, the Court dismissed the Government's request that the Court expedite its consideration of the Government's motion to revoke bail pending appeal, concluding that it was wiser to first resolve Mr. Russell's motion for compassionate release. *Order on Gov't's Mot. for Expedited Order* (ECF No. 894). This motion is now fully briefed and under advisement.

### E. Motion for Compassionate Release

On December 11, 2020, Mr. Russell filed a motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). *Rodney Russell's Mot. for Compassionate*

*Release and Mot. for Modification of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)* (ECF No. 892) (*Def.'s Mot.*).   On December 17, 2020, the Government responded in opposition.   *Gov't's Obj. to Def.'s Mot. for Compassionate Release* (ECF No. 899) (*Gov't's Opp'n*).  Mr. Russell replied on December 21, 2020.  *Rodney Russell's Reply to Gov't's Obj. to His Mot. for Compassionate Release and Mot. for Modification of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)* (ECF No. 901) (*Def.'s Reply*).  Two days later, Mr. Russell, through counsel, informed the Court that counsel misread Mr. Russell's medical records and that Mr. Russell does not suffer from COPD or asthma.  *Letter from Att'y William S. Maddox to Hon. John A. Woodcock, Jr.* (Dec. 23, 2020) (ECF No. 903).

## II.   FACTUAL BACKGROUND

The Court draws much of this factual background from Mr. Russell's Second Revised Presentence Investigation Report (PSR).   *See Restricted U.S. Probation Filing*, Attach. 1, *PSR* (ECF No. 896).  At the April 21, 2016 sentencing hearing, Mr. Russell confirmed that the portions of the PSR not addressing his offense conduct were accurate and correct.   *Tr. of Proceedings* at 17:16-18:12 (ECF No. 729) (*Sentencing Tr.*).  The Court relied on the PSR to sentence Mr. Russell.  *Id.*; *Statement of Reasons* at 1 (ECF No. 662).[1]

---

[1]   The Court adopted the PSR with two changes.  First, the Court found the drug quantity to be 762 kilograms of marijuana for a base offense level of 28.  *Statement of Reasons* at 1.  Second, the Court did not apply the two-level enhancement for possession of firearms.  *Id.*

A.      **Criminal History**

On September 15, 2010, a federal grand jury issued a six-count indictment of Mr. Russell, alleging six false statements in connection with a health care benefit program, in violation of 18 U.S.C. § 1035(a)(2).  *United States v. Russell*, 1:10-cr-00149-JAW, *Indictment* (ECF No. 3).  On April 28, 2011, a federal jury convicted Mr. Russell of four counts of false statements and acquitted him of two counts.  *Id.*, *Jury Verdict* (ECF No. 78).  On March 8, 2012, the Court sentenced Mr. Russell to five months of incarceration, three years of supervised release, a fine of $5,000, and a $400 special assessment.  *Id.*, *J.* (ECF No. 136).

Mr. Russell appealed his conviction to the Court of Appeals for the First Circuit, which on August 26, 2013 affirmed the conviction.  *United States v. Russell*, 728 F.3d 23 (1st Cir. 2013).  Mr. Russell sought a writ of certiorari with the United States Supreme Court and before the Supreme Court ruled on the petition for writ of certiorari, the Solicitor General confessed error, which led the Supreme Court on April 21, 2014, to accept certiorari, vacate the First Circuit's opinion, and remand for further proceedings.  *Russell v. United States*, 572 U.S. 1056 (2014).

On May 20, 2014, the First Circuit issued an order on remand, vacating two of the four convictions but affirming the other two.  *Russell*, *J.* (ECF No. 160).  Mr. Russell unsuccessfully challenged the First Circuit ruling both at the First Circuit and at the Supreme Court.  The First Circuit rejected his motion for reconsideration and the Supreme Court denied his second petition for writ of certiorari.  Meanwhile, the Government moved to dismiss the two vacated and

remanded counts of conviction, and on August 20, 2014, the Court granted the Government's motion to dismiss. *Id.*, *Order* (ECF No. 179). On October 29, 2014, the Court resentenced Mr. Russell on the two remaining counts of conviction, re-imposed a term of incarceration of five months, re-imposed a three-year period of supervised release, reduced the fine to $2,861.00, and reduced the special assessment to $200. *Id.*, *Am. J.* (ECF No. 185). At his April 21, 2016 sentencing hearing in the instant case, Mr. Russell was a criminal history category II. *Statement of Reasons*, Attach. 1, *Findings Affecting Sentencing* ¶ 5 (ECF No. 662).

     **B.**    **Offense Conduct**

       **1.**    **The Investigation**

The offense conduct was investigated by a combination of authorities from the Maine Drug Enforcement Agency (MDEA), the Drug Enforcement Administration (DEA), the Department of Homeland Security Investigations (HSI), Customs and Border Protection (CBP), the Maine Warden Service (MWS) and the Maine State Police (MSP). *Id.* ¶ 5. The investigation began on September 17, 2009, when MSP received an anonymous email that a large marijuana growing operation existed on land owned by Malcolm French, referred to as TW 37, in rural Washington County, Maine. *Id.* The emailer accused Mr. French and a man named Kendall Chase of being involved with "truckloads" of marijuana, and that gates and camouflage were used to conceal the operation. *Id.*

On September 21, 2009, MWS entered Mr. French's land through an open gate and spoke with a man who told MWS they had no right to be on the property and

asked them to leave. *Id.* ¶ 6. During the morning hours of September 22, 2009, MWS and CBP personnel flew an airplane over the property and observed what they believed to be marijuana growing on the property. *Id.* A second helicopter "fly over" confirmed the presence of a marijuana growing operation, observing that the marijuana grow was located deep within a 22,000 acre parcel of land in TW 37 that was owned by Haynes Timberland, Inc., a closely held corporation owned by Mr. French and his wife Barbara. *Id.* As the helicopter hovered over the property, smoke and flames erupted from the area. *Id.* In response to the fire, MWS accessed the property and discovered a marijuana grow compound consisting of nine buildings. *Id.* Two of the buildings had burned and a third structure had been set on fire, but authorities found another six undamaged structures. *Id.* The structures were generally two stories in height and were painted green and/or camouflaged by tarps and nets to avoid detection from the air. *Id.*

A short time later, authorities stopped a pick-up truck driven by Mr. French about two miles from the scene. *Id.* ¶ 7. MDEA interviewed Mr. French, who admitted having men working in TW 37, and when asked about the marijuana growing operation, he indicated he owned a lot of property and people had grown marijuana on his land for years. *Id.*

A subsequent search of the marijuana grow compound revealed numerous items of paraphernalia related to a large-scale marijuana growing and packing operation, including ten pounds of drying marijuana, marijuana "shake," soil, fertilizer, water, camouflage clothing, agriculture equipment, and six one hundred

pound propane heaters used to dry the marijuana. *Id.* ¶ 8. A search of the area, pursuant to state and federal warrants, led to the discovery of eight hundred planters, each containing three to four marijuana plants. *Id.* Each plant was tagged with a label that bore an alphanumeric code, and each plant had a different colored ribbon attached. *Id.* In total, authorities seized 2,943 live marijuana plants, which they estimated to be worth between $3,000,000 and $4,000,000 in resale value, based on the amount of marijuana likely harvested and an average sale price of $2,500 per pound. *Id.* The search also led to the discovery of DNA evidence on numerous items and a motor vehicle registered to Moises Soto, as well as an envelope addressed to Moises Soto, c/o Rodney Russell found at Mr. Russell's address in Bangor, Maine. *Id.*

On September 24, 2009, agents executed a search warrant for Mr. French's home in Enfield, Maine. *Id.* ¶ 9. The search led to the discovery and seizure of three vacuum sealing machines which contained marijuana "shake," dry marijuana "shake" in the attic, two ounces of marijuana in the kitchen area, one ounce of marijuana in a freezer in the basement, one hundred pound propane tanks similar to those in the marijuana grow compound, pallets and agriculture equipment similar to those in the grow compound, and $9,350 cash. *Id.* Authorities also found numerous firearms inside the residence. *Id.* Searches of the six grow sites in TW 37 revealed wire pots with Pro Mix potting soil, a bunkhouse, drying shacks and Rabbit Guard wire fencing. *Id.* Additional searches at a warehouse owned by Mr. French in TW 31 and at his camp in LaGrange, Maine also revealed evidentiary items consistent with the manufacture of marijuana. *Id.*

### 2.   The Conspiracy

The Government subsequently launched a lengthy investigation into the marijuana manufacturing and trafficking activities of Mr. French, Mr. Russell, and Kendall Chase, as well as Scott MacPherson, who committed suicide in 2011.  *Id.* ¶ 10.  Testimony from witnesses indicated that initially, Mr. French allowed other individuals to grow marijuana on his property in exchange for a fee.  *Id.*  Later, he decided to grow marijuana on his own land since he had the business acumen to maximize the profit potential.  *Id.*  Mr. Chase contributed to the conspiracy through his knowledge about how to manufacture and harvest high-quality marijuana.  *Id.* By no later than 2005, they were growing marijuana together in rural Maine.  *Id.*

Testimony described Mr. French as "in charge" and the overall leader of what evolved into a large-scale marijuana growing endeavor.  *Id.*  It was Mr. French's idea to use migrant workers and illegal aliens as a labor force because he knew he could pay them lower wages, they would not steal the marijuana, they were less likely to contact law enforcement since most of them were in the United States illegally, and they lacked the ability to identify the exact location of the marijuana grow compounds.  *Id.*  By late 2006, Mr. Russell joined Mr. French and Mr. Chase in the conspiracy.  *Id.*  Mr. Russell was involved with the marijuana grows on a daily basis and he, along with Mr. MacPherson, supervised the migrant workforce.  *Id.*

In late 2007, Mr. French recruited Moises Soto into the conspiracy.  *Id.* ¶ 11. Mr. Soto was a naturalized U.S. citizen who was originally from Mexico and fluent in both English and Spanish.  *Id.*  One of Mr. Soto's roles in the conspiracy was to recruit

Mexican laborers for the marijuana growing operation.  *Id.*  Mr. Soto and others induced the workers to travel to Maine, and in some instances, the workers were recruited under false pretenses.  *Id.*  For example, they believed they were being hired to work in the Christmas tree industry, not manufacturing or harvesting marijuana. *Id.*  Once the workers arrived in Maine, Mr. Soto transported them from where they resided to the marijuana growing operation on multiple occasions each month.  *Id.* Mr. Soto also acted as a translator for Mr. French, Mr. MacPherson, and Mr. Russell. *Id.*  He instructed the migrant workers on how to move around society and not raise suspicion and stressed the importance that they wash themselves after working in the marijuana fields.  *Id.*  In addition, Mr. Soto paid the migrant workers weekly and wired money to the workers' families in Mexico.  *Id.*

The PSR includes additional pertinent information that certain witnesses provided to the government and/or testified to at trial.  *Id.* ¶ 12.  One witness, Winston McTague, was initially a social acquaintance and later an employee of Mr. Chase.  *Id.* ¶ 13.  He joined the marijuana grow operation in TW 37 and performed a variety of functions.  *Id.*  In 2005, he participated in the marijuana harvest.  *Id.*  In 2006, he helped grow marijuana plants from seeds.  *Id.*  Once the seedlings were mature enough to be transplanted, Mr. McTague helped plant four to seven plants per basket.  *Id.*  In 2006, he estimated they planted sixty baskets on Mr. French's Wesley, Maine property and twenty-five baskets on Mr. French's LaGrange, Maine property.  *Id.*  Mr. McTague testified that Mr. French, Mr. Chase and Mike Smith were the "bosses."  *Id.*  In the winter of 2005 and 2006, he drove

Mr. Smith and Mr. Chase around as they delivered marijuana to customers and collected proceeds from the sales. *Id.* Mr. McTague was supposed to be paid $1,000 per week for his efforts, but only received $600 to $800 every other week or every three weeks. *Id.* He also testified that the "bosses got the peons hooked on coke and kept us working for coke." *Id.* Mr. McTague anonymously contacted MSP multiple times. *Id.* ¶ 14.

Amanda Gorrell dated Mr. French's son, Thomas, from 2007 to October 2008. *Id.* ¶ 15. She testified that she accompanied Thomas to buy a large number of plastic trash cans, which Thomas said was related to a salmon restoration project, and delivered them to a site in LaGrange. *Id.* On another occasion, she went with Thomas to purchase a large amount of chicken wire, which was supposedly for his grandfather, but Thomas delivered it to his father. *Id.* Ms. Gorrell believed Thomas was being unfaithful, since he was often too busy to spend time with her. *Id.* Thomas explained to her that the real reason he was not spending time with her was because he was busy assisting his father with the manufacture and sale of marijuana. *Id.* He further told her the trash cans and chicken wire were for the marijuana growing operation. *Id.*

Another witness, Derek King, reported that in 2007, he entered Mr. French's land on foot without permission through an open gate. *Id.* ¶ 16. Mr. King stated that Mr. French was visibly angry and directed him to leave the area, following him back to the open gate. *Id.* During the encounter, Mr. King observed a firearm, likely a semi-automatic pistol, on Mr. French's lap. *Id.*

13

Another witness, Jared Flewelling, testified that in 2007 he learned there was a large amount of marijuana at Mr. French's family camp in LaGrange, Maine. *Id.* ¶ 17. Mr. Flewelling went to the camp and observed a plastic trash can with several large plastic bags, each containing numerous ziplock baggies of marijuana. *Id.* He took three of the bags, which had an aggregate weight of about thirty pounds of marijuana, which he stored at his house for re-sale purposes before it was discovered by his stepfather, who called the police. *Id.*

Fai Littman was the college roommate of Mr. Russell's son, Neal Russell. *Id.* ¶ 18. He testified that Mr. Russell began supplying him with marijuana in 2008. *Id.* He initially received only a half-pound of marijuana per occasion but eventually began obtaining five pounds of marijuana per transaction. *Id.* Most of the marijuana was delivered directly to Mr. Littman by Mr. Russell, but there were occasions when the marijuana was delivered by either Mr. French or Thomas French. *Id.* There was also an occasion when Mr. Littman went to Mr. French's home in Enfield, Maine to obtain marijuana. *Id.* The routine sale of marijuana to Mr. Littman stopped in the summer of 2009, but in fall of 2009, for the last time, Mr. Littman went to Mr. Russell's home and obtained three or four pounds of marijuana. *Id.*

Several migrant worker witnesses provided further information. In late 2007, Miguel Angel Roblero-Velasquez was driven by Mr. Soto from Florida to Maine after being told there was employment for "planting pine trees." *Id.* ¶ 19. When they arrived in Maine, Mr. Soto delivered Mr. Roblero-Velasquez to a structure in a rural area, believed to be the warehouse compound in TW 31. *Id.* The migrant workers

14

often worked twelve-hour days, seven days per week. *Id.* The room where he and other migrant workers stayed at the warehouse had no windows, little light, no ventilation, and there was only one door which was locked at night so they could not leave. *Id.* Mr. Soto then transported Mr. Roblero-Velasquez to the warehouse compound where he first learned he would be caring for and harvesting marijuana plants. *Id.* Mr. Roblero-Velasquez returned to Mexico at the end of the 2008 harvest season. *Id.* In early 2009, he paid a "coyote" to bring him back to the United States, but he was kidnapped and held for ransom. *Id.* Mr. Soto paid the ransom and returned Mr. Roblero-Velasquez to Maine. *Id.*

Mr. Roblero-Velasquez stated that Mr. French was "in charge," but Mr. Russell and Mr. MacPherson also "gave the orders." *Id.* Mr. Roblero-Velasquez also observed Mr. MacPherson verbally insulting the laborers and wearing a firearm on at least one occasion. *Id.* After the helicopter fly-over in 2009, Mr. Roblero-Velasquez and the other migrant workers fled and embarked on a multi-hour trek through the woods, led by Mr. MacPherson and Mr. Russell. *Id.* Mr. MacPherson and Mr. Russell coordinated their transportation, and the laborers were eventually picked up by Robert Berg at the request of Mr. French. *Id.* Mr. Berg hid the workers in his barn, and within a day or two, Mr. Soto and a man known as "El Negro" drove the workers from Maine to New York, where they were released to "go on their own way." *Id.* Mr. Roblero-Velasquez's account of events was echoed by additional migrant worker witnesses. *Id.* ¶¶ 20-21.

15

In 2013, the Government interviewed a cooperating individual (CI) who stated that Mr. French recruited him to find migrant workers for Mr. French's marijuana growing operation in late 2007.  *Id.* ¶ 22.  The CI delivered some of the migrant workers to the garage/storage area where Mr. MacPherson lived, and the CI observed Mr. MacPherson providing instruction to the workers.  *Id.*  Mr. MacPherson informed the CI that Mr. French was the "one in charge."  *Id.*  The CI further stated that Mr. Russell and Mr. MacPherson were the people usually "on site."  *Id.*  The CI was paid to help the migrant workers flee several days after the raid on the grow compound in 2009.  *Id.*

Investigators also determined a company, Cold Stream Contracting, in West Enfield, Maine, began purchasing large quantities of peat moss (Pro Mix) in 2006 from Griffin Greenhouse in Gray, Maine.  *Id.* ¶ 23.  Records show Mr. French was listed as the company contact person, and Mr. French signed the checks to pay for the orders placed in 2006 and 2007.  *Id.*  Mr. Russell also placed orders and made frequent contact with Griffin Greenhouse on behalf of Cold Stream Contracting, on several occasions paying cash for Pro Mix orders that cost between $9,000 and $12,000.  *Id.*  In 2007 and 2008, at least four truckloads of Pro Mix were delivered to an old abandoned warehouse in Wesley, Maine, where the truck drivers were met by several individuals who unloaded the truck with a forklift and pallet lifter.  *Id.*  Based on witness testimony, the PO believed three of the individuals involved with the unloading were Mr. French, his son Thomas French, and Mr. Chase.  *Id.*  Mr. Russell also testified that he assisted Mr. MacPherson and several associates unload one

truckload of Pro Mix, and he admitted to signing a delivery slip. *Id.* Griffin Greenhouse records show the sale of 4,590 bags of Pro Mix to Cold Stream Contracting from 2006 to 2009. *Id.* ¶ 24.

Investigators also determined that in 2007, Cold Stream Contracting purchased a large amount of fencing (Rabbit Guard) from Louis Page Company. *Id.* ¶ 25. The total price of the order was about $3,000 and the weight of the order exceeded three thousand pounds, which a company representative testified was the largest single fencing order he had ever handled for the company. *Id.* Records show Mr. Russell signed and paid for the material with a check from Cold Stream Contracting. *Id.*

### 3. Drug Quantity

With respect to drug quantity, the PO concluded that Mr. Russell was responsible for all marijuana grown by the conspiracy between 2007 and 2009. *Id.* ¶ 26. The PO did not find sufficient evidence to hold Mr. Russell accountable for marijuana grown prior to 2007. *Id.* The PO took the position that one-and-a-half bags of Pro Mix were needed to fill each planter. *Id.* Since 3,180 bags of Pro Mix were purchased between 2007 and 2008, that quantity would fill 2,120 planters. *Id.* Using a conservative estimate of three marijuana plants per planter, the total number of plants manufactured from 2007 to 2008 would be 6,360 marijuana plants. *Id.* The PO also noted that 2,943 live marijuana plants were seized in 2009. *Id.* ¶ 27. In total, the PO determined that Mr. Russell was responsible for a total of 9,303 marijuana plants. *Id.* ¶ 28.

To calculate the total drug quantity, the PO applied guidance from U.S.S.G. § 2D1.1, cmt. (background), which adopts a weight of one hundred grams per plant. *Id.* The result was 930.3 kilograms of marijuana. *Id.* No additional drug quantity was attributed to any of the marijuana seized in this case or identified through other sources such as sales to customers. *Id.* The Court ultimately determined the drug quantity to be 762 kilograms of marijuana, for a base offense level of 28. *Statement of Reasons* at 1.

### C. Guideline Calculations

As a result of his criminal history and offense conduct, the Court determined that Mr. Russell was a Criminal History Category II with a Total Offense Level of 33. *Statement of Reasons* at 1. The applicable sentencing guideline range was one hundred fifty-one to one hundred eighty-eight months imprisonment, five years of supervised release and a fine between $17,500 and $2,000,000. *Id.* The Court sentenced Mr. Russell to one hundred fifty-one months of incarceration, five years of supervised release, and an $800 special assessment. *J.* at 3-7.

## III. THE PARTIES' POSITIONS

### A. Rodney Russell's Motion

Mr. Russell asks the Court to "grant his compassionate release from prison pursuant to [18 U.S.C. § 3582(c)(1)(A)(i)] . . . given his high risk factors related to his age, medical condition and weight." *Def.'s Mot.* at 1. Mr. Russell begins by addressing the statutory exhaustion requirement. *Id.* at 3. First, he contends that because he is not in BOP custody, he has no administrative remedies to exhaust. *Id.* He argues

18

that "[c]ourts have evaluated defendant's compassionate release requests on their merits in cases where similarly-situated defendants do not have administrative requirements to exhaust" and cites cases for support. *Id.* at 4 (citing *United States v. Norris*, 458 F. Supp. 3d 383 (E.D.N.C. 2020); *United States v. Barringer*, Criminal No. PJM 13-0129, 2020 U.S. Dist. LEXIS 88251 (D. Md. May 19, 2020); *United States v. Williams*, No. 19-cr-134-PWG, 2020 U.S. Dist. LEXIS 101054 (D. Md. June 10, 2020)). Second, Mr. Russell claims that "[t]he exhaustion requirement is not jurisdictional in nature and may be excused for equitable reasons, such as those that militate in [Mr.] Russell's favor." *Id.*

Turning to the merits, Mr. Russell argues that his heart conditions and possible obesity increase the risk of severe illness from COVID-19. *Id.* at 5. He also cites other conditions, such as "high blood pressure," his age of fifty-seven, "increased back pain," "eyesight issues," "cholesterol issues," "major depressive disorder," and his "need to sleep with a CPAP machine." *Id.* at 5-6. Therefore, he contends his "health condition combined with the risk presented to him from his incarceration at FMC Devens or other BOP facility, are extraordinary and compelling reasons warranting a reduction." *Id.* at 6.

Finally, he argues that he is not a danger to the community. *Id.* He claims that in the Court's order releasing him on bail pending appeal, the Court "considered the issues of danger and safety to others in the community and determined that [Mr.] Russell did not pose a risk." *Id.* at 7. He states that if released, he "would reside with his wife in the location and under the circumstances with which he has been

19

supervised since April 1, 2020 when this Court released him," and he "would submit himself to any additional restrictions and conditions of supervised release with which this Court [or] his probation officer deem appropriate." *Id.*

### B. The Government's Opposition

The Government opposes Mr. Russell's motion because his motion is "premature," he "has not demonstrated an extraordinary and compelling reason warranting his release," and "analysis of the § 3553(a) factors do not weigh in favor of release." *Gov't's Opp'n* at 1. The Government first outlines the BOP's response to the COVID-19 pandemic, claiming that the BOP "has taken significant measures to protect the health of the inmates in its charge." *Id.* at 2. The BOP is currently in Phase Nine of its Action Plan, which means that "prisoner programs are resuming using precautions to continue to fight the spread of COVID," such as using social distancing modifications, limiting group sizes, and prohibiting group sports and the use of gym equipment. *Id.* at 3. The BOP also screens all newly arriving BOP inmates for COVID-19 symptoms and temperature, restricts contractor access to BOP facilities, and limits social and legal visits. *Id.* at 4. "Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution." *Id.* at 5. "Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead," but the BOP must also weigh "other critical considerations." *Id.*

The Government next argues that "[c]ompassionate release is not available to a defendant, like [Mr.] Russell, who is not in custody," citing numerous cases. *Id.* at

8-9.  Relatedly, it argues that Mr. Russell "has not exhausted his administrative remedies before filing the instant motion."  *Id.* at 9.  The Government distinguishes *United States v. Curtis*, No. 1:14-cr-00140-JAW, 2020 U.S. Dist. LEXIS 102045 (D. Me. June 11, 2020), because Mr. Russell is not in custody, does not have a surrender date, has not served half of his sentence, and chose to seek release on bail pending appeal rather than compassionate release in prison and has resisted attempts to return to custody following the unsuccessful appeal.  *Id.* at 10-11.

Proceeding to the merits, the Government argues Mr. Russell has not established extraordinary and compelling reasons warranting his release.  *Id.* at 11.  It argues that "[t]he mere existence of the COVID-19 pandemic" is not enough and Mr. Russell "has not established that he is currently suffering from one of the [CDC's] enumerated chronic medical conditions."  *Id.* at 12.  It contends that Mr. Russell "claims to suffer from heart conditions, possible obesity, and high blood pressure, however, he has not submitted any evidence supporting those diagnoses or any other chronic medical condition that renders him at increased risk of serious illness if he contracts the virus."  *Id.* at 12-13.  Mr. Russell's most recent consultation with BOP medical staff "revealed no chronic medical conditions," his heart and lungs "appeared normal," and he had a body mass index of 28.7, and thus is not obese.  *Id.* at 13.  The Government further claims that the other health problems cited by Mr. Russell would not make him more prone to serious illness from COVID-19, according to the CDC.  *Id.* at 13 n.6.

The Government contends the 18 U.S.C. § 3553(a) factors similarly caution against release.  *Id.*  Specifically, it claims Mr. Russell was "the mastermind of a significant marijuana trafficking conspiracy who used illegal immigrants to work the operation while enduring 'inexcusably harsh and inhumane treatment,'" and when discovered, he set the compound on fire, risking the lives of firefighters and first responders.  *Id.* (citing *Sentencing Tr.* at 111-113, 114-130).  Mr. Russell also "took the witness stand in his own defense and committed perjury."  *Id.*  The Government argues Mr. Russell is "wholly unrepentant" and "a sentence reduction is not warranted now for this defendant who has not even served half of his sentence."  *Id.*

In conclusion, the Government urges the Court to consider the BOP's efforts to address the spread of COVID-19 and acknowledge that a vaccine has been developed.  *Id.* at 14.  The Government states that it is difficult to predict which BOP institution Mr. Russell would return to, but notes that as of the filing of its opposition, FMC Devens, the facility where he was previously incarcerated, had fifty-four prisoners and two staff testing positive for COVID-19, and two prisoners had died after contracting the virus.  *Id.*

### C.    Rodney Russell's Reply

Mr. Russell both amends and supplements his motion for compassionate release.  *Def.'s Reply* at 1.  First, he clarifies that when he was released in April 2020, he had "served close to 58% of his incarcerative sentence."  *Id.* at 2.  He next points to the Court's March 31, 2020 order releasing Mr. Russell on bail pending appeal and argues that the Court had found the COVID-19 crisis presented an "exceptional

reason" under 18 U.S.C. § 3145(c), and that he was not a risk of flight or danger.  *Id.* at 2-3.  Third, he claims his medical records from FMC Devens show he has a history of "HTN or hypertension, hyperlipidemia or high cholesterol, OSA or obstructive sleep apnea for which [he] uses a CPAP machine, being overweight (decreasing), low back pain, depression and eye/vision problems." *Id.* at 3.  He also argues that the PSR lists him at 5 feet 5 inches tall and weighing 170 pounds, while his 2013 annual exam lists him as being 5 feet 4.75 inches tall and weighing 182 pounds.  *Id.*  The difference is a BMI of 28.3, which is overweight and not obese, versus a BMI of 30.63, which is obese. *Id.*  Therefore, "[i]t is safe to conclude . . . that [Mr.] Russell is at least borderline obese and that his actual height might be slightly lower than that recorded by FMC Devens." *Id.*

Regarding exhaustion, Mr. Russell avers that the Court "may hear this motion precisely because of the futility of locating an agency responsible for exercising exhaustion; the issue is mooted by the absence of the predicate." *Id.* at 5.  Mr. Russell urges the Court to borrow from the common law doctrine of impossibility and conclude that the performance of the exhaustion requirement "is rendered objectively impossible." *Id.*

Mr. Russell next amends his previous motion by noting that the records from FMC Devens indicate: "1) COPD, though not in detail; 2) [Mr. Russell's] heart issues and his family history of heart disease, though [he] does not have heart failure, coronary artery disease, or cardiomyopathy; and 3) obesity, though [he] does not

always register as obese under a BMI assessment, yet that assessment sometimes lists [him] as a quarter inch taller than he is." *Id.* at 10.

## IV.   LEGAL STANDARD

Over the course of the COVID-19 pandemic, the Court addressed the legal standard for deciding a motion for compassionate release on several occasions. *See, e.g., United States v. Crosby*, 1:17-cr-00123-JAW-01, 2020 U.S. Dist. LEXIS 199085, at *16-23 (D. Me. Oct. 27, 2020).  Put succinctly, 18 U.S.C. § 3582(c)(1)(A)(i) permits a court to modify a term of imprisonment when (1) "extraordinary and compelling reasons warrant" the movant's release, (2) release is consistent with "the factors set forth in [18 U.S.C. §] 3553(a)," and (3) release comports with "applicable policy statements issued by the Sentencing Commission . . . ." 18 U.S.C. § 3582(c)(1)(A).[2]

The United States Sentencing Commission issued a policy statement under United States Sentencing Guideline § 1B1.13 for addressing compassionate release motions under § 3582(c)(1)(A).[3]  This policy statement requires that the movant must

---

[2]     Section 1B1.13 of the United States Sentencing Commission Guidelines addresses reductions in the terms of imprisonment under 18 U.S.C. § 3582(c)(1)(A).  But the Commission promulgated these provisions before Congress enacted the First Step Act.  *See United States v. Brooker*, 976 F.3d 228, 230-34 (2d Cir. 2020) (discussing the history of § 1B1.13 and the First Step Act).  As Judge Hornby of this District noted, the "Second, Fourth, Sixth and Seventh Circuits have . . . ruled that the Guideline policy statement applies only to motions brought by the Director of the Bureau of Prisons, not to motions for relief brought by defendants, and nothing limits judges' discretion in considering 'the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release.'" *United States v. Almeida*, Nos. 2:17-cr-52-DBH-01, 2:11-cr-127-DBH-01, 2021 U.S. Dist. LEXIS 364, at *4 (D. Me. Jan. 4, 2021) (quoting *Brooker*, 976 F.3d at 235-37 and citing *United States v. McCoy*, 981 F.3d 271, 281-83 (4th Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-11 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020)); *see United States v. Gowdy*, No. 20-60800 Summary Calendar, 2020 U.S. App. LEXIS 40409, at *3 (5th Cir. Dec. 28, 2020) (describing whether § 1B1.13 applies to motions for compassionate release as an "open question"); *United States v. Pelloquin*, No. 20-12818-DD, 2020 U.S. App. LEXIS 39966, at *4 (11th Cir. Dec. 21, 2020) (characterizing the issue as "not frivolous").

[3]     As the Court has previously discussed, "[t]he Sentencing Commission promulgated this policy statement before the emergence of the COVID-19 pandemic and before the changes to § 3582 put in place by the FIRST STEP Act; its provisions are therefore not directly related to the unique

meet the "requirements of subdivision (2)," which provides that a court must determine that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 cmt. n.1 (U.S. SENTENCING COMM'N 2018) (U.S.S.G.). Section 3142(g) sets forth four factors that a court must consider before releasing a person pending trial. They include: (1) the nature and circumstances of the offense, specifically whether the crime is a crime of violence or involves a controlled substance; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g).

The policy statement also provides criteria for determining whether "extraordinary and compelling reasons" exist to release the defendant. U.S.S.G. § 1B1.13 cmt. n.1. These reasons include certain enumerated terminal illnesses and similar conditions, physical, functional, mental, or cognitive impairments, age, family circumstances, and other unenumerated reasons. *Id.* § 1B1.13 cmt. n.1 (A-D). The policy statement further provides that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." *Id.* § 1B1.13 cmt. n.2. Finally, it states that "[p]ursuant

---

circumstances presented by a global pandemic. Nevertheless, the Court finds the policy provisions are a useful starting point for its analysis of the compassionate release motion." *Crosby*, 2020 U.S. Dist. LEXIS 199085, at *20 n.1. Similarly, Judge Hornby of this district has ruled that this policy statement "'provides helpful guidance' but 'is not ultimately conclusive given the statutory change.'" *United States v. Rembert*, No. 2:12-CR-66-DBH, 2020 U.S. Dist. LEXIS 210841, at *1 (D. Me. Nov. 11, 2020) (quoting *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 U.S. Dist. LEXIS 115388, at *5 (D. Me. July 11, 2019), *aff'd*, No. 19-1785 (1st Cir. July 23, 2020)). The Court agrees.

to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." *Id.* cmt. n.3.

The movant bears the burden of proving that he is entitled to a sentence reduction, and "the Court has broad discretion in deciding whether to grant or deny a motion for sentence reduction." *United States v. Curtis*, No. 1:14-cr-00140-JAW, 2020 U.S. Dist. LEXIS 102045, at *12 (D. Me. June 11, 2020) (quoting *United States v. Britton*, 473 F. Supp. 3d 14, 16 (D.N.H. 2020) (internal citations omitted)).

## V.   DISCUSSION

The Court reviewed Mr. Russell's motion along with the Government's response and the applicable law. The Court concludes that, notwithstanding the availability of compassionate release or related exhaustion issues, Mr. Russell's health conditions are not extraordinary and compelling reasons warranting his release. Moreover, the nature of Mr. Russell's offense, the relatively short time he has served in relation to his one hundred fifty-one-month sentence, and the need for the sentence served to fulfill the sentence imposed tip the scales against release.

### A.   Availability of Compassionate Release

Mr. Russell is in a unique position. He was convicted following a jury trial, sentenced to about twelve and-a-half years imprisonment, and served over six years in prison before the Court released him on bail pending appeal of his motion for new trial. The First Circuit since affirmed this Court's denial of Mr. Russell's motion for new trial and so Mr. Russell finds himself in a state of limbo—he is not in prison, but he is not entirely free. He has been at liberty for the past eleven months but still has about five years left on his federal sentence with a motion to revoke bail looming. The

26

question is whether 18 U.S.C. § 3582(c) applies to defendants who, like Mr. Russell, started serving considerable time on their federal sentence but have since been released on bail pending appeal.

Both Mr. Russell and the Government marshal impressive arguments for and against the availability of the compassionate release law in this unique situation. *See Gov't's Opp'n* at 8-9; *Def.'s Reply* at 6. The Government relies on the logical proposition that a judge may not release someone who is already released and points to the mandatory administrative exhaustion requirement before a motion for compassionate release may be filed. In response, Mr. Russell puts forth the commonsense viewpoint that a judge should not require a released person to return to jail in order to release him. The Court views this situation as anomalous and rare, where a person having served years in prison has been released pending appellate resolution of a motion for new trial and the conviction is then affirmed. The Court determines it is not necessary to resolve this uncertain legal issue because assessing the merits of Mr. Russell's motion for compassionate release, the Court has concluded that he has not sustained his burden to justify release. Accordingly, the Court has assumed, without deciding, that Mr. Russell can bring the motion for compassionate release and has reached its merits.

## B.    Extraordinary and Compelling Reasons

To grant Mr. Russell's motion under 18 U.S.C. § 3582(c)(1)(A)(i), the Court must find "extraordinary and compelling reasons warrant[ing]" a reduction in

sentence.  According to the Centers for Disease Control and Prevention (CDC), there are several factors that increase a person's risk of severe illness from COVID-19.

Arguably, the most decisive factor is a person's age.  *Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Mar. 3, 2021).  Generally, the risk of COVID-19 increases as a person ages, and over eighty percent of deaths occur in people who are sixty-five or older.  *Id.*  However, people younger than sixty-five may still face high risk of complications.  *Id.*  Not in the highest risk group at age fifty-seven, Mr. Russell is still more likely to require hospitalization from COVID-19 than a younger adult.

People with certain medical conditions are also at high risk of serious complications.  The CDC guidelines distinguish between a list of underlying medical conditions that place adults of any age at greater risk of severe illness from COVID-19 and a list of underlying medical conditions that "might" place an adult of any age at greater risk of severe illness.  *People with Certain Med. Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Mar. 3, 2021) (*CDC COVID Med. Conditions*).  The Court assesses Mr. Russell's underlying medical conditions against the CDC guidance.

According to the CDC, people with "heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies" are in the first category of individuals who are at an increased risk of severe illness from COVID-19. *Id.*  Additionally, people

with "hypertension or high blood pressure" are in the second category of individuals who "might" be at an increased risk for severe illness. *Id.*

The exact nature of Mr. Russell's heart condition is not clarified by this record. In his reply brief, Mr. Russell claims he has "heart issues and his family history of heart disease" but states that he "does not have heart failure, coronary artery disease, or cardiomyopathy." *Def.'s Reply* at 10. It is Mr. Russell's burden to establish extraordinary and compelling reasons, and on the record before it, the Court cannot find he has any heart conditions that, according to the CDC, would put him at an increased risk of severe illness.

The BOP medical records from March 19, 2020 show that he has underlying hypertension. *Id.*, Attach. 1, *BOP Health Services – Clinical Encounter* (*Mar. 19, 2020 BOP Medical Records*). The record confirms that as of March 19, 2020, Mr. Russell was prescribed four medicines for hypertension, including low dose aspirin. *Id.* at 4. The CDC states that a normal blood pressure is less than 120 systolic and less than 80 diastolic. *See Facts About Hypertension*, CDC, https://www.cdc.gov/bloodpressure/facts.htm (last visited Mar. 3, 2021). Fortunately, on March 19, 2020, a doctor recorded Mr. Russell's sitting blood pressure at 119/80, *Mar. 19, 2020 BOP Medical Records* at 2, and therefore Mr. Russell's blood pressure on that date was on the high side of normal. The doctor concluded that his hypertension was "well controlled" and prescribed a continuation of his medicines and monitoring. *Id.* at 5. Mr. Russell has not supplied any updated medical records, if they exist, since his release from incarceration. The Court does not know whether

the CDC guidance about persons at increased risk due to hypertension applies to people like Mr. Russell whose hypertension is under control with medication, but even assuming he is at some degree of greater risk due to hypertension of severe illness, Mr. Russell has not shown that the risk justifies compassionate release because his hypertension is under medical control.

Mr. Russell also contends that his obesity places him at a higher risk. According to the CDC, obesity is one of several conditions that place a person in the first category of individuals who are at an increased risk of serious complications from COVID-19. *CDC COVID Med. Conditions.* The CDC defines "obesity" as a body mass index (BMI) of more than 30 and less than 40 kg/m² and "severe obesity" as a BMI of more than 40 kg/m². *Id.* In terms of risk of severe illness from COVID-19, the CDC does not differentiate between obesity and severe obesity. People who are "overweight," defined by the CDC as a BMI more than 25 and less than 30 kg/m², "might" be at an increased risk. *Id.*

It is unclear whether Mr. Russell is obese. While he claims obesity, he acknowledges that he "does not always register as obese under a BMI assessment, yet that assessment sometimes lists [him at] a quarter inch taller than he is." *Def.'s Reply* at 10. For example, the PSR lists Mr. Russell at 5 feet 5 inches tall and 170 pounds, while a 2013 medical exam lists him at 5 feet 4.75 inches tall and 182 pounds. *Id.* at 3. Mr. Russell's most recent medical assessment from March 19, 2020 states that his weight is "decreasing" and lists it at 172.2 pounds but does not list his height. *Mar. 19, 2020 BOP Medical Records* at 2. Mr. Russell did not object to the PSR listing

his height at 5 feet 5 inches, but even using the more statistically favorable height of 5 feet 4.75 inches, Mr. Russell does not meet the CDC's definition of obese.  At 5 feet 4.75 inches tall and 172.2 pounds, Mr. Russell's BMI is 28.9 (78.1 kg/1.644 m² = 28.9). Rather than obese, Mr. Russell is overweight, meaning he "might" be at a higher risk of serious illness from COVID-19.  Furthermore, the March 19, 2020 medical record states that his weight was "decreasing" and, once again, Mr. Russell has not supplied any updated medical records since his release from incarceration on April 1, 2020.  As it is Mr. Russell's burden to demonstrate his eligibility for compassionate release, the Court finds that his weight is a slight, but equivocal factor in favor of his release.

Mr. Russell also cites a number of other health conditions: back pain, eyesight issues, cholesterol issues, major depressive disorder, and sleep apnea, for which he requires a CPAP machine.  *Def.'s Reply* at 10-11.[4]  The CDC does not list any of these conditions as putting someone at a higher risk for severe illness.

The next step of the Court's compassionate release analysis typically involves consideration of the COVID-19 conditions at the defendant's prison.  Even though Mr. Russell is not currently in prison, the Court is directing him to self-report to FMC Devens, where he was previously incarcerated.  The BOP website describes FMC Devens as an "administrative security federal medical center with an adjacent minimum security satellite camp."  *FMC Devens*, BOP,

---

[4]     In his reply, Mr. Russell also complains of asthma and COPD.  *Def.'s Reply* at 10.  However, in a later filed letter to the Court, Mr. Russell's counsel clarifies that "Rodney Russell does not suffer from COPD or asthma."  *Letter from Att'y William S. Maddox to Hon. John A. Woodcock, Jr.* (Dec. 23, 2020).

https://www.bop.gov/locations/institutions/dev/ (last visited Mar. 3, 2021).  There are 721 inmates with 672 at the FMC and 49 at the camp.  *Id.*

The BOP has made some restricted progress in inoculating at FMC Devens. According to the BOP, it has inoculated 302 staff members, but no inmates. *COVID-19 Coronavirus*, BOP, https://www.bop.gov/coronavirus/ (last visited Mar. 3, 2021).  As FMC Devens is currently not receiving any visitors, the Court draws some comfort that the risk of outside transmission of the virus into FMC Devens has been somewhat mitigated by the inoculation of its staff, but the Court also acknowledges that its unvaccinated inmates continue to be vulnerable.

The latest statistics from FMC Devens are somewhat encouraging.  *Id.*  The BOP website lists only one inmate as having tested positive for COVID-19.  *Id.*  Nine staff members have tested positive.  *Id.*  Tragically, ten inmates have died from COVID-19, but no staff have died.  *Id.*  Three hundred and eighty-six inmates and fifty-four staff have recovered from COVID-19.  *Id.*

The Court also agrees that the COVID-19 situation in prisons is fundamentally different than in general society.  Mr. Russell asserts that if released, he would live in Maine with his wife "in the location and under the circumstances with which he has been supervised since April 1, 2020."  *Def.'s Reply* at 12.  Thus, even though the Court is unable to quantify the risk, the Court concludes that, if released, he would have some degree of lower risk of contracting COVID-19 than he would in prison.

A final point raised by Mr. Russell warrants discussion.  In his reply brief, he quotes the Court's March 31, 2020 order releasing him on bail pending appeal, stating

"the Court concludes that the COVID-19 crisis presents an 'exceptional reason' under Section 3145(c)." *Def.'s Reply* at 2 (quoting *Order on Emergency Mot. for Release* at 19-20). This takes the Court's statement out of context. First, that statement was in the context of 18 U.S.C. § 3145(c), not an 18 U.S.C. § 3582(c)(1)(A) motion for compassionate release. Second, the Court's statement in that order was heavily influenced by the First Circuit's instruction that Mr. French and Mr. Russell "raised a substantial question within the meaning of 18 U.S.C. § 3143(b)(1)(B)." *Order of Ct.* (ECF No. 855). In considering the Government's argument that Mr. Russell's health conditions were not sufficient to justify release, the Court stated "if Mr. French and Mr. Russell presented only these risks without the First Circuit's Section 3143(b)(1)(B) determination that they currently present a substantial question on appeal, the Court would be faced with a different question since a significant portion of the federal prison population in the United States could present a medical history as concerning as either Mr. French's or Mr. Russell's medical histories and could credibly argue that the current COVID-19 crisis places them at an enhanced risk of contracting the virus and suffering dangerous consequences if they do." *Order on Emergency Mot. for Release* at 19. The Court concluded, "[e]ven if the COVID-19 crisis is exceptional, the Court is not faced with the argument that the risk of incarceration from the crisis alone would fit the 'exceptional reasons' standard of § 3145(c) and justify immediate release. Combined with the First Circuit's determination, however, the Court concludes that the COVID-19 crisis presents an 'exceptional reason' under Section 3145(c) for immediate release." *Id.* at 19-20. Based

on the First Circuit's March 26, 2020 order, the Court predicted the First Circuit would reverse, and thus granted Mr. Russell's release pending appeal. The First Circuit has since affirmed his convictions, and the Court must now determine anew whether Mr. Russell's health conditions and the COVID-19 pandemic provide extraordinary and compelling reasons to warrant release under 18 U.S.C. § 3582(c)(1)(A).

Only two conditions put forth by Mr. Russell have been determined by the CDC as conditions that "might" put him at an increased risk of severe illness from COVID-19. Even accepting that Mr. Russell is overweight or borderline obese and that he has well-controlled underlying hypertension, the Court concludes that Mr. Russell has not carried his burden to prove the existence of extraordinary and compelling reasons warranting a reduction in sentence.

### C.    Danger to the Community

The Court must also determine whether Mr. Russell poses a danger to the community, and the Court readily concludes Mr. Russell is not a danger to the community. Mr. Russell was successfully released on bail pending trial and did not have any disciplinary actions while incarcerated. *Pretrial Services Report Addendum* at 1 (ECF No. 862). Mr. Russell remains married and has been living with his wife in Maine, and the Probation Office determined that any risks could be reduced with bail conditions. *Id.* at 2. Furthermore, Mr. Russell has been out of prison for the past eleven months and there is no evidence that he has caused any trouble. Moreover, if released, Mr. Russell would still be subject to five years of supervised release, and he

has said he would "submit himself to any additional restrictions and conditions of supervised release with which this Court [or] his probation officer deem appropriate." *Def.'s Mot.* at 7.

### D.   The Section 3553(a) Factors

Finally, the Court must consider the factors set forth in 18 U.S.C. § 3553(a). The Court concludes those factors weigh against release.  The Court has given particular weight to the serious nature and aggravating circumstances of Mr. Russell's offense.  The offense conduct involved an extensive and sophisticated marijuana manufacturing and distribution operation, and Mr. Russell was found responsible for 762 kilograms of marijuana.  He had an integral role in this operation. During sentencing, the Court characterized him as a "utility infielder" who "did everything."   *Sentencing Tr.* at 125:22-24.   The grow operation also involved the "inexcusably harsh and inhumane" treatment of migrant workers, who "spent months locked inside a warehouse processing marijuana day in and day out."  *Id.* at 126:23-127:19.  *See id.* at 127:25-128:4 ("So it's one thing to hire illegal workers; it's another thing to abuse those illegal workers.  And I consider the treatment that each of the defendants must have been aware of, and to some extent participated in, to be deplorable, and it's a mark against each of you").  When law enforcement arrived on the scene of the operation in 2009, Mr. French and Mr. Russell carried out plans to burn the evidence, despite the presence of propane tanks throughout the compound, placing the lives of law enforcement officers and firefighters at risk.  *Id.* at 128:5-24. Finally, at sentencing the Court considered the fact that Mr. Russell took the stand

at trial and lied under oath. The Court found that Mr. French and Mr. Russell's "deliberate, calculated willingness to lie repeatedly under oath in this federal courtroom before a federal judge and a federal jury is disgraceful, and it is a black mark against both of you." *Id.* at 129:13-16. Thus, Mr. Russell's entire range of conduct both during the offense and at trial was deplorable and deserves just punishment.

When the Court sentenced Mr. Russell over four years ago it imposed a sentence that was "sufficient but no greater than necessary" at the bottom of the guideline range. *Sentencing Tr.* at 109:16-22. The Court reviewed its prior determination and reaffirms it in full. The Court received no new information that would alter its reasoning at the time of his sentencing hearing. The Court only adds that Mr. Russell has only been incarcerated for just over half of his twelve-and-a-half-year sentence. Release at this point would fail to reflect the seriousness of the offense, promote respect for the law, provide just punishment, or afford adequate deterrence.

### E.    Summary

Mr. Russell has not carried his burden of proving entitlement to compassionate release. While he is not a danger to the community, his health conditions do not present extraordinary and compelling reasons warranting release. Furthermore, given the nature and circumstances of his offenses, the § 3553(a) factors weigh strongly against his release. Despite its decision not to grant compassionate release to Mr. Russell, the Court recalls Mr. Russell well, having sentenced him twice and having presided over two of his jury trials, two sentencing hearings, and other

36

matters.  The Court wishes Mr. Russell well, certainly hopes that no harm will befall him while he serves out his prison term and that he will complete his sentence without incident.   Finally, the Court fully expects that Mr. Russell will return to society a productive and law-abiding citizen.

## VI.   CONCLUSION

The Court DISMISSES without prejudice Rodney Russell's Motion for Compassionate Release and Motion for Modification of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) (ECF No. 892).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 3rd day of March, 2021